IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:13-CV-790-D

| | |
|---|---|
| ERVIN SHERWOOD SANDERS, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

In this action, plaintiff Ervin Sherwood Sanders, Jr. ("plaintiff" or, in context, "the claimant") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying his application for supplemental security income ("SSI") on the grounds that he is not disabled. The case is before the court on plaintiff's motion for summary judgment (D.E. 31) and the Commissioner's motion for judgment on the pleadings (D.E. 35). The motions were referred to the undersigned Magistrate Judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* D.E. 37). For the reasons set forth below, it will be recommended that plaintiff's motion be allowed, the Commissioner's motion be denied, and this case be remanded.

## BACKGROUND

### I. CASE HISTORY

Plaintiff filed an application for SSI on 23 October 2008, alleging a disability onset date of 1 July 2008. Transcript of Proceedings ("Tr.") 139. On 4 August 2010, an Administrative Law Judge ("ALJ") issued a decision (Tr. 139-46) denying the application. On 10 July 2012, the Appeals Council remanded the case based on the inaudibility of a portion of the recording of the

hearing and directed that the files on the 23 October 2008 application be associated with those on another SSI application plaintiff filed in September 2010. Tr. 153-54.

On 13 December 2012, a hearing was held before an ALJ, at which plaintiff, his mother, and a vocational expert testified. Tr. 38-125. In a written decision dated 20 March 2013, the ALJ found that plaintiff was not disabled and therefore not entitled to SSI. Tr. 20-32. Plaintiff timely requested review by the Appeals Council. Tr. 14-16. On 13 August 2013, the Appeals Council admitted additional exhibits (Tr. 435-588), but denied the request for review. Tr. 8-13. On 11 September 2013, the Appeals Council vacated its 13 August 2013 order for the purpose of reviewing vision testing results for plaintiff dated 7 August 2013 he submitted ("August 2013 testing results") (Tr. 1481-83); rejected admission of the August 2013 testing results into the record on the grounds that they related to a period later than that at issue[1]; admitted the same additional exhibits as in its prior order; and denied the request for review. Tr. 1-7. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. § 416.1481. Plaintiff commenced this proceeding for judicial review on 12 November 2013, pursuant to 42 U.S.C. § 1383(c)(3). (*See In Forma Pauperis* Mot. (D.E. 1); Order Allowing Mot. (D.E. 4); Compl. (D.E. 5)).

Subsequently, on 6 January 2014, plaintiff filed another application for SSI. (*See, e.g.*, 2014 Notice of Award (D.E. 48-1) 1). On 23 July 2014, at the initial review level, the SSA found plaintiff to be blind as of the date of the application, approved the application, and awarded him benefits ("2014 award"). (*See* Notice of 2014 Award 1).

---

[1] As the foregoing citation indicates, the August 2013 testing results are included in the Transcript notwithstanding the Appeal Council's directive. They were added to the Transcript by a supplemental certification dated 2 June 2014 and appear at D.E. 28 with the supplemental certification. Having been added to the Transcript after its initial certification (on 15 January 2015 (*see* D.E. 22 at 1)), these documents are not listed in the index to the Transcript. Because the SSA ("SSA") did, in fact, include the August 2013 testing results in the Transcript, the court deems them to be part of the record, irrespective of the Appeals Council's directive. This determination, though, is not material to the court's analysis or conclusion that this case should be remanded, which would be the same if the August 2013 testing results were deemed not to be part of the record.

Case 5:13-cv-00790-D   Document 49   Filed 02/02/15   Page 2 of 23

The motions before the court have been fully briefed. Plaintiff filed a memorandum in support of his motion (D.E. 32) with exhibits, defendant a memorandum in support of her motion (D.E. 36), and plaintiff a reply memorandum (D.E. 38) with exhibits. The court held a telephone conference with counsel on 22 January 2015 regarding the impairments and evidence underlying the July 2014 award. (*See* Minute Entry dated 23 Jan. 2015). As a result of the conference, the court directed plaintiff to file the evidence he submitted to the SSA in support of the application approved in the 2014 award and citations to related authorities (*see* Text Order dated 22 Jan. 2015), which he did (*see* D.E. 39 (authorities); D.E. 40 to 45 (evidence)). On 27 January 2015, the court ordered the parties to file additional documents relating to the 2014 award. (*See* D.E. 46). In response, the Commissioner filed, among other documents, the notice of award (D.E. 48-1), the disability determination explanation (D.E. 48-3), and the 30 May 2014 evaluation of plaintiff by ophthalmologist Albert R. Munn, III of the Capital Eye Center that was apparently the principal basis for the 2014 award (D.E. 48-4). Plaintiff also filed several documents. (*See* D.E. 47; D.E. 47-1 to 47-4).

## II. STANDARDS FOR DISABILITY

The Social Security Act ("Act") defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

3

economy . . . ." 42 U.S.C. § 1382c(a)(3)(B). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . . .

20 C.F.R. § 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis. *Pass*, 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy. *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 416.923. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

## III.   FINDINGS OF THE ALJ

Plaintiff was 42 years old on the date when the 23 October 2008 application was filed and 47 years old on the date of the administrative hearing. Tr. 31 ¶ 6. The ALJ found that he has at least a high school education and past relevant work as a clean-up worker at construction sites and a dump truck driver. Tr. 30 ¶¶ 5, 7.

Applying the five-step analysis of 20 C.F.R. § 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since the 23 October 2008 application date. Tr. 22 ¶ 1. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: "degenerative disc disease of the lumbar spine; residuals in the right shoulder from a remote burn injury in 1978; left rotator cuff tendinopathy with a partial thickness tear; panuveitis with CME [*i.e.,* cystoid macular edema] of the left eye[2]; and depression." Tr. 22 ¶ 2. At step three, the ALJ found that plaintiff's impairments did not meet or medically equal any of the Listings. Tr. 23 ¶ 3.

---

[2] Uveitis is the inflammation of the uvea, which is the middle layer of the eye composed of three segments: the iris, ciliary body, and choroid. *See Stedman's Medical Dictionary*, entry for "uveitis," Westlaw at STEDMANS 963280 (last updated Nov. 2014). Panuveitis is inflammation involving all three segments of the uvea. *See* entry for "panuveitis," STEDMANS 647850.

   CME is "a painless disorder which affects the central retina or macula. When this condition is present, multiple cyst-like (cystoid) areas of fluid appear in the macula and cause retinal swelling or edema." University of Michigan Kellogg Eye Center, Patient Care, entry for "cystoid macular edema," http://www.kellogg.umich.edu/patientcare/conditions/cystoid.macular.edema.html (last visited 2 Feb. 2015).

The ALJ next determined that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b)—that is, lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds—with limitations. Tr. 24 ¶ 4; *see* 20 C.F.R. § 416.967(b).[3] The limitations are as follows:

> The claimant should never climb ladders, ropes, or scaffolds (due to shoulder pain). He can occasionally climb stairs/ramps, balance, stoop, crouch, kneel, and crawl (due to his lumbar degenerative disc disease). He should never lift overhead with both arms (due to shoulder pain and accounting for his non-severe cervical disc disease). As a vision precaution, the claimant should avoid all exposure to driving and workplace hazards of unprotected heights, and is limited to jobs requiring only occasional depth perception and peripheral vision. The claimant should avoid concentrated exposure to pulmonary irritants such as dust/odors/gases (due to his non-severe sinusitis). He is able to perform simple, routine, repetitive tasks.

Tr. 24 ¶ 4.

Based on her determination of plaintiff's RFC, the ALJ found at step four that plaintiff was not capable of performing his past relevant work. Tr. 30 ¶ 5. At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of housekeeper, folder, and sales attendant. Tr. 31 ¶ 9. The ALJ accordingly concluded that plaintiff was not disabled. Tr. 32 ¶ 10.

## IV.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

---

[3] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," http://www.oalj.dol.gov/libdot.htm (last visited 2 Feb. 2015). "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. § 416.967.

Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401.

Where, as here, the Appeals Council considers additional evidence before denying the claimant's request for review of the ALJ's decision, "the court must 'review the record as a whole, including the [additional] evidence, in order to determine whether substantial evidence supports the Secretary's findings.'" *See, e.g., Felts v. Astrue*, No. 1:11CV00054, 2012 WL 1836280, at *1 (W.D. Va. 19 May 2012) (quoting *Wilkins v. Sec'y Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991)). Remand is required if the court concludes that the Commissioner's decision is not supported by substantial evidence based on the record as supplemented by the evidence submitted at the Appeals Council level. *Id.* at *1–2.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

7

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## DISCUSSION

### I. OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff contends that this case should be remanded for the award of benefits or, alternatively, for a new hearing pursuant to sentence four of § 405(g) on the grounds that the ALJ erred by, among other means, improperly evaluating the medical opinions of a treating ophthalmologist of his, Maurice B. Landers, III, M.D., and a treating rheumatologist of his, Teresa K. Tarrant, M.D.; improperly evaluating other medical opinions; and posing an incomplete hypothetical to the ALJ. Plaintiff also contends that the July 2014 award establishes that plaintiff is disabled and should be awarded benefits or, alternatively, that the case should be remanded for a new hearing for consideration of this new evidence pursuant to sentence six of § 405(g). Because the court finds the ALJ's evaluation of the medical opinions of Dr. Landers and Dr. Tarrant dispositive of this appeal, it will address only this issue.

### II. THE ALJ'S CONSIDERATION OF THE MEDICAL OPINION EVIDENCE

#### A. Applicable Legal Standards

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the

8

claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."
20 C.F.R. § 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining
whether a claimant is disabled. *See id.* § 416.927(b); *Nicholson v. Comm'r of Soc. Sec. Admin.*,
600 F. Supp. 2d 740, 752 (N.D. W. Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b),
416.927(b), an ALJ must consider all medical opinions when determining the disability status of
a claimant."). The Regulations provide that opinions of treating physicians and psychologists on
the nature and severity of impairments are to be accorded controlling weight if they are "well-
supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not
inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2);
*see Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec.
Ruling 96-2p, 1996 WL 374188, at *2 (2 July 1996). Otherwise, the opinions are to be given
significantly less weight. *Craig*, 76 F.3d at 590.

Opinions from medical sources on the ultimate issue of disability and other issues
reserved to the Commissioner are not entitled to any special weight based on their source. *See* 20
C.F.R. § 416.927(d); Soc. Sec. R. 96–5p, 1996 WL 374183, at *2, 5 (2 July 1996). But these
opinions must still be evaluated and accorded appropriate weight. *See id.* at *3.

The ALJ's "decision must contain specific reasons for the weight given to the treating
source's medical opinion, supported by the evidence in the case record, and must be sufficiently
specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating
source's medical opinion and the reasons for that weight." Soc. Sec. Ruling 96-2p, 1996 WL
374188, at *5; *see also* 20 C.F.R. § 416.927(c)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC,
2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [*i.e.*, giving less weight to the

opinion of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

## B. Medical Opinions of Dr. Landers

Dr. Landers, who received his medical degree from the University of Michigan in 1963 and completed his residency in ophthalmology at the University of California at Los Angeles in 1967, has been practicing ophthalmology and been board certified in that specialty for over 40 years. *See* Tr. 539, 540, 541. He has a subspecialty in uveitis. *See* University of North Carolina ("UNC") School of Medicine, Maurice B. Landers, III, M.D., http://www.med.unc.edu/ophth/meet-our-faculty/clinician-bios/maurice-b-landers-iii-m-d (last visited 2 Feb. 2015). He serves as a professor at the UNC School of Medicine. *Id.* Dr. Landers was plaintiff's principal treating ophthalmologist from June 2010 through at least October 2012. Over this period, he saw plaintiff on 16 occasions. *See* Tr. 1229-31, 1232-35, 1238-41, 1249-52, 1254-57, 1264-67, 1272-75, 1279-82, 1287-90, 1314-16, 1322-24, 1325-28, 1338-40, 1343-46, 1365-67, 1373-75. Thus, on average, Dr. Landers saw plaintiff more frequently than once every other month during this period of more than two years. Dr. Landers' specialization and intensive treatment relationship with plaintiff lend weight to Dr. Landers' opinions. *See* 20 C.F.R. § 416.927(c)(2)(i), (ii), (5).

In a letter dated 8 March 2012 addressed "To Whom It May Concern," Dr. Landers provided a negative assessment of plaintiff's vision impairments:

Mr. Sanders is a 46 year old African American male who has been a patient at UNC Eye Clinic since the spring of 2010.

Mr. Sanders suffers from severe, bilateral, idiopathic uveitis. Treatment of this eye problem with local and systemic steroids has resulted in cataract[4]

---

[4] A cataract is a "[c]omplete or partial opacity of the ocular lens." Entry for "cataract," STEDMANS 149550.

development and secondary steroid induced glaucoma.[5] He has had cataract surgery in both eyes and glaucoma surgery in both eyes. Presently, the eyes are doing well although the chronic uveitis and the other problems described herein have reduced his vision. When he was first seen in the spring of 2010 he had a best corrected visual acuity of 20/40 in the right eye and hand movement only in the left eye.

Over the past eighteen months in spite of cataract surgery and glaucoma surgery and ongoing immunosuppressive medication, his vision has deteriorated to a level of 20/100 in the right eye best corrected and 20/100 in the left eye best corrected.

His intraocular pressures today are normal and thus his steroid induced glaucoma is in a remission phase.

Mr. Sanders tells me he previously worked as a truck driver. Although his visual acuity of 20/100 does not quite meet the 20/200 level for legal blindness, I nevertheless feel that he is disabled from his previous forms of work because of his poor vision in both eyes.

I have told Mr. Sanders that I did not think that his vision would ever improve significantly. I did tell him that our goal of treatment was to maintain his vision at its present level. I have instructed him to continue his current medications and return to see us in four months for a follow up examination.

Tr. 1480.

The ALJ discounted portions of Dr. Landers' opinions and gave other portions great

weight:

Maurice Landers, III, M.D. wrote a letter regarding the claimant's eyes. He indicated that the claimant has severe bilateral idiopathic uveitis. However, this is contradicted by treatment notes from 10-17-2012 that note the panuveitis is only in OU, not bilateral (Exh. B24F pp. 12-13). Dr. Landers stated that the claimant has undergone cataract and glaucoma surgery in both eyes. He admits that "presently the eyes are doing well." I give great weight to this part of the opinion, as [it] is consistent with treatment notes from 10-17-12 where the claimant reported his vision was stable (Exh. B26F). However, I assign less weight to Dr. Landers' opinion that chronic uveitis has reduced the claimant's vision and he is "disabled from his previous forms of work because of his poor vision in both eyes." Aside from being on a matter reserved to the Commission[er], this opinion is not consistent with the claimant presenting [at the hearing] a current valid driver[']s license that has no visual restrictions, nor with the treatment notes from

---

[5] Glaucoma is "[a] disease of the eye characterized by increased intraocular pressure, excavation, and atrophy of the optic nerve," which "produces defects in the field of vision and eventual blindness." Entry for "glaucoma," STEDMANS 373890.

as recently as October 2012 or back in January 2009 where the claimant had uncorrected visual acuity of 20/20 on the left and 20/30 on the right, nor with his opinion that the claimant's eyes are "doing well", nor with my observation that the claimant had no difficulty navigating in the hearing room or finding his chair, and was not wearing any corrective eyewear.

Tr. 29 ¶ 4.

Plaintiff argues that the ALJ erred in her evaluation. The court agrees, but not for all the same reasons advanced by plaintiff.

The deficiencies begin with the ALJ's discounting Dr. Landers' opinion that plaintiff has severe bilateral idiopathic uveitis. As noted, the ALJ states that this opinion is contradicted by Dr. Landers' note on his 17 October 2012 visit with plaintiff which, according to the ALJ, states that "the panuveitis is only in OU, not bilateral." Tr. 29 ¶ 4 (citing 1230-31). It is true that Dr. Landers found plaintiff's panuveitis to be in "OU." Tr. 1231. The problems is that, contrary to the ALJ's determination, "OU," short for oculus uterque, does mean bilateral, that is, both eyes. *See*, *e.g.*, Amer. Acad. of Ophthamology, Ophthalmic Abbrevs. 101, abbrev. for "OU," http://www.aao.org/yo/newsletter/201103/article02.cfm (last visited 2 Feb. 2015).[6] Thus, rather than contradicting Dr. Landers' opinion, his 17 October 2012 treatment note actually confirms it. And it is not only Dr. Landers' note of the 17 October 2012 visit that contains a finding that plaintiff has "Panuveitis OU." Tr. 1231. Dr. Landers made the same finding in his preceding ten office visits with plaintiff, on 15 August 2012 (Tr. 1234), 27 June 2012 (Tr. 1240), 7 March 2012 (Tr. 1251), 23 January 2012 (Tr. 1256), 2 November 2011 (Tr. 1266), 31 August 2011 (Tr. 2074), 18 May 2011 (Tr. 1281), 23 March 2011 (Tr. 1289), 15 December 2010 (Tr. 1316), and 24 November 2010 (Tr. 1324). Thus, there is extensive evidence supporting Dr. Landers' opinion that plaintiff had bilateral uveitis.

---

[6] "OD," short for oculus dexter, means right eye and "OS," short for oculus sinister, means left eye. *Id.*

The ALJ presumably misinterpreted this evidence—and other evidence of record that plaintiff had panuveitis "OU"—because of her misunderstanding of "OU." Indeed, the ALJ found at step two of the sequential analysis that plaintiff's panuveitis was severe in only one eye, the left eye. Tr. 22 ¶ 2 ("The claimant has the following severe impairments: . . . panuveitis with CME of the left eye . . . .").

Moreover, the term "OU" appears repeatedly throughout the medical records in reference to other eye conditions from which plaintiff suffered, besides panuveitis. *See, e.g.*, Tr. 1251 (12 Mar. 2012 office visit note of Dr. Landers listing as "OU" panuveitis, CME, and steroid-induced glaucoma). Thus, the ALJ presumably misinterpreted this evidence as showing these other conditions were present in only one eye.

In sum, the ALJ's misunderstanding of "OU" signifies that she failed to recognize on a broad scale the extent of plaintiff's eye conditions. This deficiency, of course, compromises portions of the ALJ's decision beyond her evaluation of Dr. Landers' opinions, including, as indicated, her severity analysis, but also her assessment of plaintiff's credibility, her RFC determination, and her ultimate decision on disability.

In her evaluation of Dr. Landers' opinions, the ALJ next stated that she gave great weight to Dr. Landers' assessment that "'presently the eyes are doing well.'"[7] Tr. 29 ¶ 4. But the ALJ is quoting only part of Dr. Landers' sentence. The remainder of it states: "although the chronic uveitis and the other problems described herein have reduced his vision." Tr. 1480. Dr. Landers goes on to explain that plaintiff's visual acuity has deteriorated to 20/100 in each eye best corrected. Tr. 1480. While, as discussed below, the ALJ does address separately the finding that plaintiff's vision has deteriorated, her failure to indicate that Dr. Landers expressly qualified his

---

[7] The ALJ's characterization that Dr. Landers "admits" that plaintiff's eyes are doing well suggests that the ALJ saw himself in an adversarial posture with respect to Dr. Landers. Tr. 29 ¶ 4. Needless to say, the ALJ was not, but serves as a neutral.

determination that plaintiff's eyes were doing well with the observation that his vision has deteriorated tends to overstate the degree of wellbeing found by Dr. Landers. The clear meaning of Dr. Landers' finding is that plaintiff's eyes were doing well relative to the limitations on them resulting from his various conditions, not in the abstract as if they were healthy eyes.

The ALJ justifies giving great weight to Dr. Landers' opinion that plaintiff's eyes were doing well on the basis of plaintiff's alleged report reflected in the notes of an office visit by plaintiff on 17 October 2012, not with Dr. Landers, but with a primary care physician at UNC Hospitals, Daniel T. Matthews, M.D. *See* Tr. 1226-28. Plaintiff was seeing Dr. Matthews for a follow-up on his medical problems generally. *See* Tr. 1226. The only reference to plaintiff's eye problems reads:

> 1.   Panuveitis. He is followed by ophthalmology. He is currently on immunosuppression with CellCept and prednisone. He was seen by ophthalmology earlier today. He reports his vision is stable.

Tr. 1226. Understandably, there is no indication that Dr. Matthews ever examined plaintiff's eyes since Dr. Landers had already seen him that day. *See* Tr. 1227. Instead, the focus of this visit was on plaintiff's other problems, namely, left shoulder pain, depression, testicular pain, urinary hesitancy, and a cough. *See* Tr. 1226-28. Certainly, one would not expect plaintiff's statements about his eyes at such a visit to describe as comprehensively, and thereby as accurately, the condition of his eyes as statements made, the same day, at his visit with Dr. Landers.

In contrast to Dr. Matthews' note, Dr. Landers' note on his own visit with plaintiff on 17 October 2012 indicates that plaintiff was having problems on that date, some "the same" as before, that is, stable. Dr. Landers wrote:

> Patient with panuveitis returns for follow [up. He has] a lot of pain in the left eye. Blurriness and floaters about the same. Some fl[oaters] come and go.

14

Tr. 1229. Thus, in attempting to bolster her analysis of Dr. Landers' opinions, the ALJ relied on the cursory notation by a non-eye specialist on the date in question, rather than the more detailed and overtly negative description by the patient's treating ophthalmologist. The ALJ's doing so certainly suggests that she was impermissibly choosing to cite evidence she believed was favorable to her conclusion without taking into account clearly relevant contrary evidence. *See, e.g.*, *Green v. Colvin*, Civil No. 8:12–cv–2241 DCN, 2014 WL 793067, at *12 (D.S.C.), *rep. and recomm. adopted by* 2014 WL 793067, at *1 (24 Feb. 2014) (citing *Loza v. Apfel*, 219 F.3d 378, 379 (5th Cir. 2000)).

More fundamentally, the ALJ is obviously interpreting "stable" in Dr. Matthews' note to signify that plaintiff's vision was good. In fact, though, a finding of stability does not indicate that a function or condition is good, but instead merely that its status—whatever it might be—is unchanged from some prior time. *See, e.g.*, *Kiefer v. Comm'r of Soc. Sec.*, No. 5:13–cv–679, 2014 WL 66717, at *5 (N.D. Ohio 8 Jan. 2014) (citing *Hicks v. Comm'r of Soc. Sec.*, No. C–1–08–24, 2009 WL 3127183, at *3 (S.D. Ohio 28 Sept. 2009) ("Stable" is a medical term that simply means a condition is neither better nor worse)); *Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) ("One can be stable and yet disabled."); *Davisson v. Astrue*, No. 1:10–cv–2411, 2011 WL 2461883, at *10 (N.D. Ohio 17 June 2011) ("A person can have a condition that is both 'stable' and disabling at the same time.") (citations omitted)). For example, the vision status of a blind person with no possibility of recovering his sight could be said to be stable. Thus, irrespective of Dr. Landers' findings, the finding by Dr. Matthews that

plaintiff's eyes were stable on 17 October 2012 provides scant substantiation for Dr. Landers' opinion that plaintiff's eyes were doing well in light of his conditions.[8]

The ALJ turns next to Dr. Landers' purported opinion that "chronic uveitis has reduced the claimant's vision and he is 'disabled from his previous forms of work because of his poor vision in both eyes.'" Tr. 29 ¶ 4. She states that she assigns "less weight" to this opinion.

The ALJ misstates the opinion regarding the reduction in plaintiff's vision. Dr. Landers attributed it, not simply to plaintiff's uveitis, but "the chronic uveitis and the other problems described herein," which include steroid-induced cataract development and glaucoma. Tr. 1480. The omission is notable because plaintiff's use of steroids to control the uveitis is ongoing and cataracts and glaucoma do not necessarily produce the same disturbances to vision as uveitis.

The first reason the ALJ gives for discounting the opinion that plaintiff's vision is reduced and he is thereby disabled is that it is on an issue reserved to the Commissioner. While the portion of the opinion stating that plaintiff is disabled is on an issue reserved to the Commissioner, the portion finding that plaintiff's vision is reduced is not. Hence, this first reason provides no basis for the ALJ's discounting Dr. Landers' assessment that plaintiff's uveitis and other problems have reduced his vision.

The next reason the ALJ gives is that plaintiff has a current valid North Carolina driver's license that has no visual restrictions. Tr. 29 ¶ 4. But the issuance of a driver's license is entitled to only limited weight. It reflects a license applicant's vision on a single occasion, the date of the examination. Moreover, the examination ordinarily takes no more than a minute or so; it is conducted by a license examiner who likely has very limited, if any, training in disorders of the

---

[8] Since the term "stable" appears numerous times in the medical records to describe plaintiff's impairments of all types, the ALJ's apparent misunderstanding of the term suggests the possibility that she misinterpreted the medical evidence broadly in this regard.

eye[9]; and the criteria for the examination are specific to driving. The degree to which more weight can appropriately be given to the results of such an examination than the judgment of a board-certified ophthalmologist about the overall status of a person's vision developed over years of treatment is questionable.[10]

The ALJ then cites as grounds for discounting Dr. Landers' opinion on plaintiff's reduction in vision and disability inconsistency with "the treatment notes from as recently as October 2012 or back in January 2009 where the claimant had uncorrected visual acuity of 20/20 on the left and 20/30 on the right." Tr. 29 ¶ 4. To the extent that the ALJ is stating that in January 2009 plaintiff was shown to have the specified visual acuity she is correct. On 19 January 2009, a consulting examining physician, Gonzalo A. Fernandez, M.D., found him to have that level of acuity. *See* Tr. 652. On the other hand, to the extent the ALJ is indicating that plaintiff was found to have that acuity level on 17 October 2012 she is incorrect. Dr. Landers found his uncorrected visual acuity level on that date to be 20/200 in the left eye and 20/160 in

---

[9] In the DOT, the occupation of driver's license examiner (No. 168.267-034) has an SVP (*i.e.*, specific vocational preparation) level of only 4, indicating that it requires "over 3 months up to and including 6 months [of training]"; a reasoning development level of only 3, indicating the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form . . . [and to] [d]eal with problems involving several concrete variables in or from standardized situations"; and a mathematical development level of only 2, indicating the ability to: "Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs." DOT, def. for "driver's license examiner," no. 168.267-034; app. C § II, def. of SVP levels; app C § III, def. of reasoning and mathematical development levels.

[10] In discussing plaintiff's credibility, the ALJ makes the following statement:

> However, weighing against the severity of the claimant's alleged vision problems, I note that he presented a current valid driver's license that was issued on March 16, 2011 and is good through November 9, 2019 with no vision restrictions.

Tr. 25 ¶ 4 (emphasis original). Since, as discussed, the driver's eye examination determines certain aspects of a person's visual capability simply at the time of the examination, the fact that the license is valid for an extended period says little about the status of a person's vision subsequent to the examination. One examination by a driver's license examiner in over eight years contrasts with Dr. Landers' examining plaintiff 16 times over about two years, equating to almost one examination every other month. Needless to say, the SSA itself determined less than three years into this eight-year period that plaintiff is blind. The absence of any vision restriction in the driver's license is also of questionable significance for the reasons already stated as well as the absence of evidence that corrective eyewear would help plaintiff, as discussed further below.

the right eye. Tr. 1230. Thus, rather than contradicting Dr. Landers' opinion that plaintiff's vision had deteriorated, the visual acuity findings from 17 October 2012 tend to substantiate it.

It is more likely, though, that the ALJ is referring to the 17 October 2012 finding to which the ALJ was referring is the finding in Dr. Matthews' 17 October 2012 notes that plaintiff's vision was "stable." The court has already explained why that statement does not signify that plaintiff's vision was good. Another reason the ALJ cites for discounting Dr. Landers' opinion on the reduction in plaintiff's vision and his disability is Dr. Landers' opinion regarding plaintiff's eyes doing well in light of his conditions. The court has already addressed that opinion as well.

Lastly, the ALJ relies on her observation that plaintiff "had no difficulty navigating in the hearing room or finding his chair, and was not wearing any corrective eyewear." Tr. 29 ¶ 4. While walking around a room without apparently bumping into furniture and finding one's chair shows some level of visual capacity, it would not have to be great to perform these rudimentary activities.[11]

Further, the fact that plaintiff was not wearing corrective eyewear would be some evidence of visual capacity if plaintiff's conditions could be ameliorated by such eyewear. The ALJ cites to no medical evidence that plaintiff was prescribed such eyewear and the court is aware of none.[12] Plaintiff testified at the hearing that corrective eyeglasses would not help his vision for specific medical reasons he cites. Tr. 62-63, 74, 75-76. To the extent that the ALJ is making her own judgment that corrective glasses would ameliorate plaintiff's vision problems,

---

[11] In his report on his 30 May 2014 consultative ophthalmologic valuation of plaintiff that was the basis for the July 2014 award, Dr. Munn notes that plaintiff "did walk through the office without assistance." (Comm'r's Resp. to 27 Jan. 2015 Order (D.E. 48), Ex. 3 (D.E. 48-4) 3).

[12] The notes of a 16 February 2011 visit by plaintiff to an internist state, "Vision loss is nerve related so not correctable by glasses." Tr. 1295. It appears, though, that this statement may be part of the history the physician took from plaintiff.

18

she is impermissibly making medical judgments. *See, e.g., Lawton v. Barnhart*, 121 Fed. Appx. 364 (10th Cir. 2005) ("The ALJ is simply not free to substitute his own medical opinion for that of a disability claimant's treating doctors." (internal quotation marks omitted)); *Richardson v. Astrue*, No. 5:10–CV–5–D, 2010 WL 5621136, at *6 (E.D.N.C. 2 Dec. 2010) (citing *David v. Astrue*, Civil Action No. 09–cv–00744–CMA, 2010 WL 3894003, at *11 (D. Colo. 30 Sept. 2010)), *mem. and recomm. adopted by* 2011 WL 195574 (20 Jan 2011).

Given the deficiencies in the ALJ's assessment of the opinions of Dr. Landers, particularly in light of the strength of various factors supporting their reliability, such as Dr. Landers' specialization and intensive treating relationship with plaintiff, and the potential significance of the opinions of Dr. Landers as plaintiff's principal treating ophthalmologist for over two years, the court cannot say that the ALJ's assessment of Dr. Landers' opinions is supported by substantial evidence. This is so even when considering the limitations on the weight that can be given opinions on the ultimate issue of disability. Moreover, as discussed, deficiencies associated with the evaluation of Dr. Landers' opinions taint other aspects of the ALJ's analysis. This case should accordingly be remanded for proper evaluation of Dr. Landers' opinion and the rest of the evidence in light of such evaluation.

### C.    Medical Opinions of Dr. Tarrant

Dr. Tarrant, who received her medical degree from the University of Florida, has been practicing as a rheumatologist for over ten years and is board certified in that specialty, as well as allergy/immunology and internal medicine. *See* Tr. 531, 532; UNC Medical School, Thurston Arthritis Research Center, Teresa Tarrant, M.D., http://www.med.unc.edu/tarc/about-us/faculty/teresa-k-tarrant-md (last visited 2 Feb. 2015). She completed fellowships in these three areas at Duke University. Tr. 531-32. Dr. Tarrant saw plaintiff on 10 occasions between

May 2009 and December 2012. *See* Tr. 848-50, 860-64, 1221-22, 1268-70, 1291-93, 1317-18, 1341-42, 1368-69, 1394-95, 1399-1400. As with Dr. Landers' opinions, Dr. Tarrant's specialization and intensive treatment relationship with plaintiff lend weight to her opinions. *See* 20 C.F.R. § 416.927(c)(2)(i), (ii), (5).

In her notes on her office visit with plaintiff on 5 December 2012, Dr. Tarrant opined that his uveitis could not be effectively treated and is disabling. Tr. 1221. She stated:

> Mr Sanders has severe sight-threatening panuveitis that has been refractory to all therapy to date. We can try to get Remicade on a compassionate basis, but I don't know if this will provide us more benefit beyond Cellcept. Cellcept is at the maximum dose, and I would not recommend it's use in combination with anti-TNF [*i.e.*, tumor necrosis factor]. The patient can't take Imuran due to intractable vomitting, and methotrexate is very unlikely to help beyond that of Cellcept. He and I reviewed clinical trials in uveitis. Ustekinumab will be investigated and enrolling at the NIH in 2013, but the patient cannot travel to sites outside of NC due to financial hardships. We'll continue to discuss with ophthalmology what further can be done. I do believe that his illness is severe enough that this merits permanent disability.

Tr. 1221-22.

In her decision, the ALJ made the following responsive findings:

> Similarly, I afford less weight to Dr. Teresa Tarrant's opinion from December 2012 that the claimant's panuveitis is "severe enough that this merits permanent disability" (Exh. B24F p. 3). As noted with regard to Dr. Landers' opinion above, this is a matter reserved to the Commission, is not consistent with treatment notes from this date (12-5-12) or other treatment records (see e.g., 10-17-12), nor with the other points mentioned in the preceding paragraph.

Tr. 29 ¶ 4.

Plaintiff argues that the ALJ erred in this assessment. The court agrees, although, as with Dr. Landers' opinions, not on all the same grounds relied upon by plaintiff.

One flaw evident at the outset is that the ALJ did not expressly address Dr. Tarrant's opinion that plaintiff's panuveitis has not responded to treatment. Instead, she quoted the opinion regarding disability and addressed it. Therefore, it is unclear whether the ALJ's findings

20

relate to the opinion on the resistance to treatment of plaintiff's panuveitis. As discussed previously, an ALJ is required to discuss all medical opinions and make clear the weight assigned to them. The ALJ appears not to have met that standard with respect to Dr. Tarrant's resistance to treatment opinion.

As to Dr. Tarrant's opinion on plaintiff's being disabled, the ALJ discounts it on largely the same grounds she cites for discounting the opinions of Dr. Landers. The court has found them wanting with respect to Dr. Landers' opinions and finds them no less deficient with respect to Dr. Tarrant's opinion on disability. The reasons would, of course, also be deficient if intended to apply to Dr. Tarrant's opinion regarding the resistance to treatment of plaintiff's panuveitis.

The ALJ also finds Dr. Tarrant's disability opinion inconsistent with her notes on her 5 December 2012 visit with plaintiff. Of course, the opinion appears in those notes. It is not apparent what other portions of the notes the ALJ deemed inconsistent with Dr. Tarrant's opinion.

Notably, Dr. Tarrant's opinions are consistent with Dr. Landers' opinions. Both opined, in effect, that plaintiff's eye conditions severely limited his vision and could not be effectively treated. Dr. Landers did so by stating:

> Over the past eighteen months in spite of cataract surgery and glaucoma surgery and ongoing immunosuppressive medication, his vision has deteriorated to a level of 20/100 in the right eye best corrected and 20/100 in the left eye best corrected.
> . . . .
> I have told Mr. Sanders that I did not think that his vision would ever improve significantly.

Tr. 1480. Similarly, Dr. Tarrant states, "Mr[.] Sanders has severe sight-threatening panuveitis that has been refractory[13] to all therapy to date." Tr. 1221. Thus, the two principal specialists

---

[13] Refractory means resistant to treatment. Entry for "refractory," STEDMANS 770180.

most recently treating plaintiff for his eye conditions reach fundamentally the same assessment of the impact of these conditions on plaintiff's vision.

As with the ALJ's assessment of Dr. Landers' opinions, the court cannot say that the ALJ's evaluation of Dr. Tarrant's opinions is supported by substantial evidence in light of the deficiencies discussed and the indicia of their reliability, including Dr. Tarrant's specialization and extended treatment relationship with plaintiff, even when taking into account the limitations on the weight to be accorded opinions on the ultimate issue of disability. This case should therefore be remanded for proper evaluation of Dr. Tarrant's opinions and the other evidence of record in light of such evaluation.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion (D.E. 31) for judgment on the pleadings be ALLOWED, the Commissioner's motion (D.E. 35) for judgment be DENIED, and this case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Recommendation.

In making this ruling, the court expresses no opinion on the weight that should be accorded any piece of evidence. That is a matter for the Commissioner to decide.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have until 16 February 2015, or such other date as the court directs, to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District

Judge. Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 2nd day of February 2015.

James E. Gates
United States Magistrate Judge